**UNITED STATES of America, Plaintiff,**

v.

**Alvin HEGGE, Defendant.**

**No. CR–85–124–1.**

United States District Court, E.D. Washington.

April 1, 1986.

See also, 636 F.Supp. 119.

Sid Wurzburg, Spokane, Wash., for plaintiff.

James B. Crum, Asst. U.S. Atty., Spokane, Wash., for defendant.

MEMORANDUM OPINION RE: CLOSURE OF PRETRIAL HEARING ON MARCH 26, 1986

QUACKENBUSH, District Judge.

On March 26, 1986, on motion of Sid Wurzburg, attorney for the defendant, this court ordered that the pretrial hearing of that morning be closed to the public and the press. Prior to that Order, the court afforded members of the press the opportunity to be heard on the proposed closure and the court further advised members of the press that it would be available at any time that counsel for any member of the media wished to be heard on the issue. On March 27, 1986, Duane Swinton, counsel for Cowles Publishing Company, the publisher of the only Spokane newspapers, appeared before the court, objected to the closure Order, and requested the court to release transcripts of the March 26, 1986 hearing. This court denied that motion. This memorandum will set forth the factual background and findings of the court as to the necessity for the closure of the March 26, 1986 hearing.

FACTUAL BACKGROUND

While this court is thoroughly familiar with Mr. Hegge's background and the massive and pervasive coverage in this district of Mr. Hegge's alleged previous criminal activities, trials and convictions, a summary thereof is necessary to enable a reviewing court to understand the nature and extent of that alleged activity and the press coverage thereof. The massive amount of press and media coverage of Mr. Hegge's activity would undoubtedly fill several, if not many, file drawers.

It has been thoroughly reported in the press that Mr. Hegge is, or has been, the president of the Ghost Riders Motorcycle Club. What must be made clear herein, is that Mr. Hegge is indicted on charges of Conspiracy to Possess Controlled Substances With Intent to Distribute (Count I) and Unlawful Transportation and Receipt of Firearms in Interstate Commerce (Count II). Evidence of Mr. Hegge's recent murder conviction in the State of Wisconsin and his alleged implication in the murder of Spokane Police Detective Brian Orchard would not appear in any manner to be matters which could be considered by the jury in Mr. Hegge's trial on the two charges in this case. Likewise, evidence of his alleged, and thoroughly reported, other criminal activities would not be admissible in the trial of the pending charges, *sub judice.* The matters presented in the March 26, 1986 hearing would also not be admissible in the trial of this case which was scheduled to commence April 14, 1986.

Prior to 1983, Mr. Hegge and the Ghost Riders had been the subject of numerous articles in the Spokane paper(s), including, in part, articles linking them to arson/insurance fraud incidents; the murder of a former club member in the Province of Alberta, Canada; the murder of a Wenatchee, Washington, man in 1980; the disappearance and suspected murder of a Wenatchee woman in 1981; and the murder of a man at the Red Robin Tavern in Spokane. The media reports on these alleged crimes were substantial, however, they were minimal compared to the massive media coverage of the shooting death of Spokane Police Detective Brian Orchard.

In June, 1983, Detective Brian Orchard of the Spokane Police Department was shot and killed while on a stake-out of the alleged resale of guns stolen in a Wenatchee, Washington burglary. While such an event may not have been unusual in large metropolitan areas of this country, this was the first time a police officer had been killed in the line of duty in the Spokane area in over fifty years. The Spokane paper and television stations covered this murder and the resultant trials extensively. To say the least, those matters became front page-top headline stories.

Mr. Hegge's name immediately surfaced in the news reports of Detective Orchard's death. The two individuals arrested on the murder charges, Lonnie Link and Donald Beach, were reported to have been in a car which was, or had been, registered to Mr. Hegge. However, Mr. Hegge was not at that time charged in connection with Detective Orchard's death. He was charged in 1985 with aiding and abetting the murder of Detective Orchard. He has not been tried on that charge in that a prior Wisconsin murder charge was yet to be tried and the charges in this case were pending.

In 1985, Mr. Hegge was charged with first degree murder by the State of Wisconsin arising out of a tavern fire and resultant death in that state. Trial of that case took place in late 1985. Mr. Hegge was convicted of first degree murder and other charges. That trial received extensive newspaper coverage in this district along with television reporting thereof, including the playing of television tapes from the trial on Spokane television stations.

Shortly after the Wisconsin trial of Mr. Hegge, this court attempted to select a jury in this district for the trial of the charges in *United States of America v. Billy McEwen*, CR–85–125–1–JLQ. Mr. McEwen was charged in the same indictment with Mr. Hegge. While the jurors were not acquainted with Mr. McEwen, they were thoroughly acquainted with Mr. Hegge and his criminal record. These jurors were not only from the Spokane area but also from other locations in this district as far as two hundred miles from Spokane. The Spokane paper is distributed throughout this district and the Spokane television and radio stations reach the greater portion of the district. It is clear that other newspapers in this district published in smaller localities have also given Mr. Hegge extensive coverage. A copy of the attempted jury selection in the *McEwen* case has been prepared and made a part of the record in this case. A copy of that transcript has been furnished the press. In the *McEwen* case, this court concluded that in view of the extensive knowledge of the jury panel of Mr. Hegge's unrelated criminal activities, Mr. McEwen could not obtain a fair trial in this district. The government did not contend otherwise. As a result, the court granted Mr. McEwen's motion for change of venue to another district. Those proceedings and Mr. Hegge's alleged participation in that alleged criminal activity received full coverage by the media.

Thereafter, another named defendant in this case, Donald Schade, entered a plea of guilty to Count I of the indictment. In the sentencing phase of that case, a two-day hearing was conducted as to Mr. Schade's participation in the conspiracy. This hearing included live testimony of Donald Beach and Lonnie Link, the convicted murderers of Detective Orchard. Link and Beach testified concerning Schade's participation in the conspiracy and Mr. Hegge's alleged leadership role therein. This pro-

ceeding and Mr. Hegge's involvement received thorough coverage by the press. Other defendants named in the Hegge indictment have pled guilty and the role of Mr. Hegge was included in news reports thereof.

Another recent case in this district in which the press reported Mr. Hegge's alleged criminal activities was that of *United States of America v. Lonas,* CR–85–123–1. This case was tried to a jury in August, 1985, and included testimony that Lonas was shot in Coeur d'Alene, Idaho, while committing a house burglary at the behest of Mr. Hegge. That testimony again received full coverage by the media.

Following completion of the murder case against Mr. Hegge in Wisconsin in late 1985, Mr. Hegge was returned to this district in January of this year to stand trial on the charges pending in this case. Every event therein has been thoroughly reported by the media, starting with the transportation from Wisconsin and arrival of Mr. Hegge in this district. One of the first motions filed by appointed counsel for Mr. Hegge was for a change of venue. At the first hearing on motions, Mr. Hegge informed the court that he did not join in this motion. The court, Mr. Wurzburg, and counsel for the government expressed beliefs that Mr. Hegge might not be able to obtain a fair and impartial jury in this district and urged Mr. Hegge to join in the change of venue motion. Assistant United States Attorney James Crum who has served in that position for over thirteen years and tried many high-profile criminal cases, had previously informed the court at the time of Mr. Hegge's arraignment that he believed it would be impossible to find a fair and impartial jury in this district to try Mr. Hegge. (See newspaper article of January 31, 1986 attached to Ct.Rec. 38). The court informed Mr. Hegge that he must make a decision on March 20, 1986 on the change of venue.

On March 20, 1986, despite the recommendation of all concerned, including the court, Mr. Hegge exercised his constitutional right to be tried in this district and refused the change of venue. This refusal caused this court immediate concern that a serious conflict existed, or was arising, between the defendant's constitutional right to be tried in the district where charged and his Sixth Amendment right to a trial by a fair and impartial jury. These concerns are expressed in this court's Order Re: Change of Venue dated March 21, 1986, filed herein as Ct.Rec. 32, which is attached hereto as Appendix "A".

The basis of the court's and counsel's concern over the ability to empanel a fair and impartial jury in this district was the massive, intensive, and pervasive media and press coverage of Mr. Hegge's alleged and established criminal activity involving at least two murders. Evidence of those murders and the other criminal activity of Mr. Hegge are not related to the charges pending in this case and evidence thereof would not be admissible in this trial. Clearly, attempted introduction of such evidence by the government at trial would seem to require a mistrial. Yet, from the prior attempted jury selection in *United States of America v. McEwen, supra,* it is clear that in December, 1985, some ninety percent (90%) of all prospective jurors were aware of these irrelevant and prejudicial activities by Mr. Hegge. Since that attempted jury selection, and since Mr. Hegge's return to this district, there has been additional complete and intensive media reporting of Mr. Hegge's other criminal activity in the coverage of the pretrial proceedings in this case. The court fears that the percent of all prospective jurors who are or have become aware of these activities may have increased since the attempted jury selection in *United States of America v. McEwen.* In this court's thirty-two years of association with the criminal justice system in this district, I have never seen the amount of press coverage of one individual's alleged criminal activity over such an extended period of time.

The posture of this case is in stark contrast to some of the other reported cases where defense allegations of prejudicial pretrial publicity ware the basis for so-

called "gag" orders on the participants and the press. The *Abscam* and *DeLorean* cases come to mind. However, in those cases a principal contention involved the pretrial publication of *admissible* evidence in the actual trial. In this case, the massive pretrial publicity is of highly prejudicial matters which cannot be presented to the jury in the trial of this case. These include, but are not limited to, evidence of Mr. Hegge's Wisconsin murder and other convictions and his alleged involvement in the murder of Detective Orchard.

These were the circumstances existing on March 26, 1986, when the court, without prior notice, was presented with the defense motion to close the hearing which was about to commence. Serious questions already existed as to whether a fair and impartial jury could be found, even without the reporting of alleged additional misconduct attributed to the defendant in the March 26, 1986 hearing. The court was aware that this testimony would probably be prejudicial to the defendant, but *inadmissible at the trial.* The March 26, 1986 testimony confirmed that matter. Publication of these additional matters could well be "the straw that broke the camel's back" as to the court's ability to have this case tried. Certainly, the people of this district, and this country, have the right to have criminal charges such as those pending against this defendant tried on their merits by a fair and impartial jury, rather than possibly having those charges dismissed or delayed. This court's research fails to reveal any published case where such a result, a dismissal, was obtained, however, the seriousness of the problem facing the court on March 26, 1986, and the immediacy thereof, after the defendant had refused a change of venue, was clear.

## ANALYSIS

As stated in this court's oral opinion on March 27, 1986, it is this court's practice, when faced with a closure request, to give representatives of the media, and their counsel, the opportunity to appear and be heard before a decision is made on such a request. The time constraints existing on March 26, 1986, in this case did not allow for a continuance for that purpose, although representatives of the press in attendance on March 26, 1986 were given the opportunity to be heard. As previously stated, the court informed those in attendance that it would make itself available at any time requested by counsel for the media for argument on the matter. That opportunity was afforded counsel at 9:00 A.M., on March 27, 1986. The court's usual practice of affording counsel an opportunity to be heard before ruling is in accordance with the rules of this circuit in *United States v. Brooklier,* 685 F.2d 1162 (9th Cir.1982) and also in *Gannett Co. v. DePasquale,* 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979). Mr. Murphy, representing the Cowles Publishing Company did enter a blanket objection when given the opportunity to be heard on March 26, 1986.

The reason this court did not continue the March 26, 1986 hearing to first give the press the opportunity to consult counsel and in turn to be heard through counsel prior to the hearing is twofold. First, the court was unaware that such a closure motion was to be presented on March 26th. All parties, counsel, and the witnesses were present. Secondly, counsel and the court were operating under severe time constraints. The trial was set to commence on April 14, 1986, and the defendant had refused to request a continuance or accede thereto. Mr. Wurzburg was scheduled to leave at the end of the week for Madison, Wisconsin to pursue his investigation of this case and the testimony given in Mr. Hegge's murder trial as it relates to this case. If evidence had developed in the March 26, 1986 hearing which would have required additional investigation, subpoenaing of witnesses, and further evidentiary hearings, the time prior to trial for such matters was extremely limited. Under these circumstances, the court felt constrained to proceed with the hearing, after it had given the press the opportunity to be heard, with the further opportunity for counsel for any objectors to be heard as

soon as they were prepared. This procedure was reasonable in this court's opinion under *Brooklier, supra,* at p. 1165, which teaches that "[i]n determining what steps are reasonable, a court should avoid any that might result in a material delay in the underlying proceedings."

Turning to the propriety of a court closing a pretrial hearing, it is clear that until recently, the right of the press to attend pretrial hearings has not received the same constitutional protection as the right of the press to attend actual trials themselves or the right of the press to publish information concerning the defendant prior to trial. *Gannett Co., Inc. v. DePasquale County Court Judge,* 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979); *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). While *Gannett Company* has not be overruled, it has been limited by both recent Ninth Circuit law and United States Supreme Court opinion.

In *United States v. Brooklier,* 685 F.2d 1162 (9th Cir.1982), the Ninth Circuit panel reviewed media challenges to the district court's closure order in three instances, *after trial had commenced.* The closures commenced with the voir dire of the jury and included suppression hearings after the jury had been selected. While denying the media's petition for writ of mandamus, the court in *Brooklier* found that the district court's procedural process was inadequate. More importantly, the circuit panel discussed the applicability of the public's First Amendment right of access to suppression hearings held during the course of the trial. The panel further stated at p. 1171 of *Brooklier,* that "it would elevate form over substance to deny access to an identical proceeding because it began prior to trial." While it is not the role of this court to judge the wisdom of the Ninth Circuit's observations, this court's personal philosophy accords with that expressed in *Brooklier.* A logical distinction between the public and media's right of access to trial proceedings as opposed to pretrial hearings is extremely difficult to make. The Supreme Court made that distinction in

*Gannett, supra,* only by applying the word "trial" as contained in the Sixth Amendment in its limited literal sense.

■ In *Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), the Supreme Court pointed out that the opinion in *Gannett* did not reach the question of the public and press' right to attend a pretrial suppression hearing. The Court in *Waller* stated that a majority of the Justices in *Gannett* "concluded that the public had a qualified constitutional right to attend such hearings." Justice Powell further pointed out in *Waller* that the right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial. Guided by these precedents, this court concludes that the same presumption of openness should be applied to pretrial proceedings such as took place on March 26, 1986, as would be applied in the actual trial itself.

The reasons for this rule are clearly set forth in *Gannett.* Besides the right of the people and the press to attend, observe, and evaluate the fairness of a trial, a trial court has several options available to it to protect actual trial jurors, once selected, from prejudicial materials which might be published during the trial itself. These options include clear and succinct admonitions to the jurors not to read or listen to anything outside of the courtroom. Secondly, the trial judge has the option of sequestering the jury, even with its attendant uprooting of jurors from their homes, families, and jobs and the consequent cost to the government. The options available to a trial court in attempting to provide a defendant a true, as opposed to a *pro forma* fair trial where highly prejudicial, inadmissible *pretrial* material has been intensively published, are much more limited.

One effort which may be made is "emphatic and clear instructions on the sworn duty of each juror to decide the issues only on evidence presented in open court." *Nebraska Press Association v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). While this court recognizes that

some honest, well-meaning members of jury panels truly follow such instructions, the practical difficulties in this case include the fact that Mr. Hegge's prior criminal convictions and alleged other "prior bad acts" are of the most serious and prejudicial nature, but are *inadmissible* in the trial of the charges contained in the indictment in this case. The right of a defendant, including Mr. Hegge, to a fair and impartial jury as guaranteed by the Sixth Amendment requires more than mere lip service thereto. Any attorney who has participated in the trial of high profile criminal cases is fully aware of the realities of the effect on the jury of prejudicial, inadmissible, pretrial publicity of which the jurors have knowledge, even though the trial jurors have stated they would disregard such material. This court has participated in many high profile cases, including first degree murder charges, as a prosecutor, defense attorney and, in the past six years, as a federal trial judge. Those experiences have only heightened the concern of the court in this case as to the ability of the court to enpanel a truly fair and impartial jury in this district to try the charges pending against Mr. Hegge.

Another, and by far the best option which the court hoped would be available in this case, was a change of venue to another district where the jury panel would not have been exposed to the inadmissible, highly prejudicial, information concerning this defendant. When, on March 20, 1986, the defendant precluded this option, the concern of the court was greatly enhanced. The court, as previously stated, was already aware of the vast knowledge by a prior jury panel of Mr. Hegge's alleged activities through the attempted jury selection in the companion case of *United States of America v. McEwen, supra.*

The final option suggested by *Nebraska Press, supra,* as cited by Cowles Publishing Company is "postponement of the trial to allow public attention to subside." Mr. Hegge has refused any continuance of the trial of this matter. However, in considering Mr. Hegge's circumstances, a continuance of this trial will not result in a diminu-

tion of intensive publicity about Mr. Hegge's other alleged criminal activity nor provide a prophylaxis through a "quiet period." Mr. Hegge is currently charged with second degree murder in Spokane County Superior Court in connection with Detective Orchard's murder. If trial of this case is continued, there is no reason to believe that the second degree murder trial, with all its related and extensive press coverage will not proceed as required by law. Throughout the pretrial proceedings in this case, Mr. Hegge has demanded strict compliance with the Speedy Trial Act and there is no reason to believe he would not make similar demands upon the State of Washington in that jurisdiction's pending case. Likewise, there is no reason to believe that Mr. Hegge's second degree murder trial arising out of the death of Detective Orchard would not receive the same massive publicity that the trials of Donald Beach and Lonnie Link received. As such, a continuance of this matter would only enhance, rather than inhibit, the memories of prospective jurors as to Mr. Hegge's alleged serious criminal violations. As stated above, evidence of Mr. Hegge's involvement in Detective Orchard's death here in Spokane and his murder conviction in Wisconsin are not related in any manner to the charges pending in this case and would be inadmissible therein. Mr. Hegge is also awaiting further sentencing in the State of Wisconsin on his convictions of arson, theft by fraud, and endangering safety by conduct "regardless" of life. Judge Torphy, the Wisconsin presiding judge, has agreed to withhold sentencing on those charges until after completion of the trial in this case. A continuance of the trial of this action, which would surely be over the objection of the defendant, would obviously result in additional adverse prejudicial information being presented to the jury panel. Even if a continuance of this trial was considered by the court, over the objection of the defendant, such a continuance would have to be a very lengthy one with attendant risk of loss of government

and defense witnesses or the dimming or loss of memories by those witnesses.

In summary, when the defendant refused a change of venue on March 20, 1986, it became clear to all concerned, the court, the Assistant United States Attorney, and defense counsel, if not Mr. Hegge, although his motivation is not clear, that obtaining a truly fair and impartial jury in this district would be extremely difficult, if not impossible. If such were the case, a true constitutional conflict would exist, to wit: the constitutional right of the defendant to be tried in this district as guaranteed by the Sixth Amendment (Ct.Rec. 32) and his right to an impartial jury as guaranteed by the Sixth Amendment. This confrontation is brought to the fore in this case by the fact that the massive and intense pretrial publicity is of a highly prejudicial nature, not related to the pending charges and, in fact, clearly inadmissible in the trial thereof. The stark reality of this constitutional conflict was the principal reason for this court closing the pretrial hearing on March 26, 1986. The March 26, 1986 hearing also involved testimony of a highly prejudicial nature which would not be admissible in this trial. The history of the press' interest in Mr. Hegge and the massive coverage of all matters related to him convince this court that if the content of the March 26, 1986 hearing were made public, another large, if not banner headline and lead television and radio story would result to the effect that: DETECTIVE RELATES HEGGE'S _____."

While this court is unaware of any reported case where criminal charges have been dismissed because a fair and impartial jury could not be empaneled, this court will undoubtedly face such a motion. While there may unfortunately be those who may suggest that the prejudicial pretrial publicity has been so replete that "a little more can't hurt," such an attitude flies in the face of our constitution which provides that the right to trial by a fair and impartial jury is "the most fundamental of all freedoms." *Estes v. Texas*, 381 U.S. 532, 540, 85 S.Ct. 1628, 1632, 14 L.Ed.2d 543 (1965). This right includes a truly impartial jury,

not just one that thinks it can be fair. Our constitution provides for the right to a fair trial by a panel of impartial, indifferent jurors, who are truly indifferent as they stand unsworn. This court's prior experience in the Hegge related matters convinces it that the people of this relatively small district, as a whole, are already thoroughly acquainted with the great majority of the published materials concerning Mr. Hegge and are closely following all ongoing reports. The reporting of the March 26, 1986 proceedings before this court would in itself, along with the prior matters, constitute a serious and imminent threat to Mr. Hegge's right to a fair trial. Assistant United States Attorney Crum, at the March 26, 1986 hearing, recognized the seriousness of the problem by joining in the defendant's closure motion. The joinder in that motion by the government took place under the Department of Justice regulations which recognize "the vital public interest in open judicial proceedings," and the government's "general overriding affirmative duty to oppose their closure." 28 C.F.R. § 50.9.

■ The right of access to pretrial proceedings by the public and the press is not absolute and must be balanced against the defendant's Sixth Amendment right to a fair trial. *Sacramento Bee v. United States District Court*, 656 F.2d 477, 482 (9th Cir.1981). In *Sacramento Bee*, the Ninth Circuit refused to issue a writ of mandamus where the press challenged the closure of various trial proceedings which took place out of the presence of the jury. This court has explored every reasonable alternative to closure of the March 26, 1986 hearing in an effort to balance the press' right of access to the courts against the defendant's right to a fair trial. In this case, the press' qualified right to attend the pretrial hearing must yield to the defendant's right to a fair trial. The publication of the alleged misconduct by the defendant and his associates, as revealed in the March 26, 1986 hearing would result in a substantial probability that this defendant's right to a fair trial might be compromised.

In almost six years on the federal trial bench, this court has handled an average of over one hundred individual felony cases per year, including many high profile cases. I have never granted a prior closure or "gag" order in any pretrial or trial proceeding. Only because of the serious and imminent threat to this defendant's right to be tried by a fair and impartial jury and in turn the right of the people to have criminal charges orderly and timely disposed of without the risk of dismissal or reversal did I grant the closure motion in this case. While counsel for Cowles Publishing has not suggested any alternatives to the court, I am willing to consider any suggested alternatives which the press has an obligation to present. See *Sacramento Bee, supra,* at p. 482 and *United States of America v. Brooklier, supra,* at p. 1169. This court would consider releasing transcripts of the March 26, 1986 hearing to the press upon its commitment not to publish the content thereof until after selection and sequestering of the jury, if that is found necessary, or until the further order of the court, if the jury is not sequestered.

Finally, this court has lived in this district throughout the lengthy, massive, and pervasive press coverage of Mr. Hegge and his alleged extensive criminal activities and is thoroughly familiar therewith. I do not feel the press at this time should be burdened with producing copies of the volumes of articles covering these activities. The total is voluminous, however, if there is any contention or doubt as to the nature, extent, and pervasiveness thereof, it may be necessary that full copies of these stories and television tapes be made available for review on appeal.

The motion of Cowles Publishing Company is DENIED, with leave to renew.

IT IS SO ORDERED.

## APPENDIX A

### ORDER RE: CHANGE OF VENUE AND ORDER OF EXCLUDABLE TIME

The defendant has been indicted on charges of Conspiracy to Possess a Controlled Substance and Unlawful Transportation of Firearms in Interstate Commerce. On February 14, 1986, counsel for the defendant, Sid Wurzburg, filed a Motion for Change of Venue (Ct.Rec. 15).

The basis of this motion was the extensive pretrial publicity concerning the defendant, his alleged complicity in the death of Spokane Police Officer Brian Orchard, his recent first degree murder conviction in the State of Wisconsin, and his association with the Ghost Riders Motorcycle Club. The government responded to this motion (Ct.Rec. 21) and stated that it had no objection to the Motion for Change of Venue.

On February 28, 1986, the court heard argument on the pretrial motions then pending. The defendant appeared in person with Mr. Wurzburg. At this time the defendant informed the court that he did not agree with the Motion for Change of Venue. The court at that time informed the defendant that he had a right to be tried in the district in which he was charged, however, in view of the court's knowledge of the substantial adverse pretrial publicity on matters not admissible at the trial of the pending charges, the court recommended to Mr. Hegge that he should follow his attorney's advice as to a change of venue. The court advised Mr. Hegge of the extensive knowledge of Mr. Hegge which the jury panel evidenced during the attempted jury selection of a co-defendant in *United States v. McEwen,* CR–85–125–1.

Mr. Hegge informed the court that he wanted more time to consider the matter. To assist Mr. Hegge in making this decision, the court ordered that a transcript of the attempted jury selection in *U.S.A. v. McEwen* be prepared at government expense and furnished to Mr. Wurzburg and Mr. Hegge. The court continued the hearing on the change of venue matter to March 20, 1986 to allow time for the preparation of that transcript and thorough review thereof by Mr. Hegge and his counsel.

On Monday, March 17, 1986, Mr. Hegge was again before this court with his attorney on various pro se motions filed by Mr.

Hegge. At that time, the court reminded Mr. Hegge of the March 20, 1986 hearing on the change of venue motion, and again recommended to Mr. Hegge that his trial not take place in this district. On March 20, 1986, Mr. Hegge again appeared before this court with his attorney. The government was represented by James Crum, Assistant United States Attorney. Mr. Hegge advised the court that despite the recommendations of the court and his counsel, he did not desire a change of venue and desired to be tried in this district where he was indicted.

This defendant has a constitutional right to be tried in the district in which he was indicted. A defendant cannot be forced to accept a change of venue against his will. *United States v. Abbott Laboratories*, 505 F.2d 565, 572 (4th Cir.1974); *United States v. DiJames*, 731 F.2d 758, 761 (11th Cir. 1984). This right is recognized in Fed.R. Crim.P. 18 and 21(a). Rule 21(a) mirrors this right as clearly set forth in Article III, section 2, clause 3 of the United States Constitution and the Sixth Amendment thereto. Rule 21(a) provides in part that "[t]he court *upon motion of the defendant* shall transfer the proceeding as to him to another district ... if the court is satisfied that there exists in the district where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial...." (Emphasis supplied). When a defendant and his attorney disagree on the place of trial, the wishes of the defendant must control.

This court is satisfied that Mr. Hegge fully understands that upon request the court would change the place of trial of this matter to a district which had not received the pre-trial publicity. I am satisfied that Mr. Hegge's refusal to make that request is knowing and intelligent waiver of the right to a change of venue. Mr. Hegge has presented numerous written and oral motions to the court. He has, in effect, acted as co-counsel with Mr. Wurzburg, a most able, competent, and experienced criminal defense attorney who the court appointed to represent Mr. Hegge. Mr. Hegge has been involved in previous criminal justice matters and the pleadings which he has filed reflect his full understanding of his rights and the criminal justice process.

Mr. Hegge takes the position that the government has "created" the adverse publicity against him and I am sure that Mr. Hegge has in mind the presentation, either in this court or on appeal, if convicted, of a motion to dismiss or the granting of a new trial, if a conviction results from the trial in this district. Mr. Hegge is cautioned that in this court's opinion, and that of Mr. Wurzburg as stated in open court, such an argument would be rejected since Mr. Hegge refuses to request a change of venue. A ruling in favor of Mr. Hegge on such a motion would be contrary to the interests of society in having the guilt or innocence of a defendant determined in trial. Having waived his opportunity for a change of venue, Mr. Hegge may be required to demonstrate the existence of actual prejudice from pretrial publicity in a convincing manner.

Mr. Hegge has also refused the court's offer of an additional ten-day period of time for commencement of trial of this matter form April 14, 1986 to April 24, 1986. This period would give Mr. Wurzburg additional time to prepare for the trial and would extend the time between recent pretrial publicity and the date of trial. Mr. Hegge has refused to waive his rights under the Speedy Trial Act. 18 U.S.C. § 3161, *et seq.*

By reason of the foregoing IT IS HEREBY ORDERED as follows:

1. Trial of the above-entitled matter shall commence in Spokane, Washington on Monday, April 14, 1986 at *10:00 A.M.*, instead of 1:30 P.M.

2. Requested jury instructions, requested jury voir dire and trial briefs shall be served and filed on or before April 7, 1986.

3. Pursuant to 18 U.S.C. § 3161(h)(1)(F) the period from February 14, 1986 (change of venue motion filed) to March 20, 1986 (disposition of motion) is HEREBY DE-

522

CLARED EXCLUDABLE for purposes of computing time under the Speedy Trial Act.

IT IS SO ORDERED. The Clerk is directed to enter this Order and forward copies to counsel.